UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

————————————————————

)
BERNARD DAVID NELSON,                    )
                                         )
        Plaintiff,                       )
                                         )
v.                                       )        Civil No. 21-10334-LTS
                                         )
U.S. CITIZENSHIP AND IMMIGRATION )
SERVICES and UR M. JADDOU,               )
DIRECTOR, U.S. DEPARTMENT OF             )
HOMELAND SECURITY;                       )
U.S. CITIZENSHIP AND IMMIGRATION )
SERVICES,                                )
                                         )
        Defendants.                      )
————————————————————)


ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
(DOC. NOS. 36, 39)

June 15, 2022

SOROKIN, J.

        The Plaintiff, Bernard David Nelson, challenges the denial of his I-140 visa petition in

the Employment Based First Preference Extraordinary Ability Category ("EB-1a petition") by

Defendants U.S. Citizenship and Immigration Services ("USCIS") and Ur M. Jaddou, Director of

the U.S. Department of Homeland Security and USCIS.  Doc. No. 12.[1]  Nelson alleges that the

denial of his petition was arbitrary and capricious in violation of the Administrative Procedure

Act ("APA").  Id.  Presently before the Court are the parties' cross-motions for summary

judgment.

---

[1] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing
system; pincites are to the page numbers in the ECF header.

As the name suggests, extraordinary ability visas are reserved for those rare individuals who have "risen to the very top of [their] field of endeavor."  8 C.F.R. § 204.5(h)(2).  Though Nelson is undoubtedly a skilled professional, the Court cannot say that the Defendants acted arbitrarily in determining that his accomplishments fell short of the demanding EB-1a standard. After careful consideration of the administrative record before it, the Court therefore DENIES the Plaintiff's Motion for Summary Judgment and ALLOWS the Defendants' Motion.

I.      BACKGROUND AND PROCEDURAL HISTORY

Nelson, a citizen and national of the United Kingdom, filed his EB-1a petition on December 6, 2019, based on his abilities in the field of "style analysis and quantitative risk management."  Certified Administrative Record ("CAR") 0387, 0404, 1086.  His petition defines style analysis and quantitative risk management as:

> the process used to determine what type of investment behavior a particular investor or money manager uses to make investment decisions. Virtually all investors subscribe to some distinct form of investment philosophy.  As a result, prudent analysis of a money manager's style is crucial to determining whether the manager will be a good fit for the investor's personal goals and preferences.

CAR 0406.  At the time, Nelson was employed by Style Analytics, Inc., a technology company "that develops and provides analysis software for investment professionals in the financial sector." [2]  Statement of Facts ("SOF"), Doc. No. 47 ¶ 4.

The EB-1a designation is available to a non-citizen who "has extraordinary ability in the sciences, arts, education, business, or athletics which has been demonstrated by sustained national or international acclaim and whose achievements have been recognized in the field through extensive documentation."  8 U.S.C.A. § 1153(b)(1)(A).  The petitioner may

---

[2] Style Analytics was formerly known as Style Research, Inc.  SOF ¶ 4.  Nelson served as President of Style Analytics and later as the Chief Research Advisor.  CAR 0408.

demonstrate eligibility for the designation by presenting evidence that he "sustained national or international acclaim" through a major "one-time achievement," or evidence that he meets at least three of the following ten criteria:

> (i) Documentation of the alien's receipt of lesser nationally or internationally recognized prizes or awards for excellence in the field of endeavor;
>
> (ii) Documentation of the alien's membership in associations in the field for which classification is sought, which require outstanding achievements of their members, as judged by recognized national or international experts in their disciplines or fields;
>
> (iii) Published material about the alien in professional or major trade publications or other major media, relating to the alien's work in the field for which classification is sought. Such evidence shall include the title, date, and author of the material, and any necessary translation;
>
> (iv) Evidence of the alien's participation, either individually or on a panel, as a judge of the work of others in the same or an allied field of specification for which classification is sought;
>
> (v) Evidence of the alien's original scientific, scholarly, artistic, athletic, or business-related contributions of major significance in the field;
>
> (vi) Evidence of the alien's authorship of scholarly articles in the field, in professional or major trade publications or other major media;
>
> (vii) Evidence of the display of the alien's work in the field at artistic exhibitions or showcases;
>
> (viii) Evidence that the alien has performed in a leading or critical role for organizations or establishments that have a distinguished reputation;
>
> (ix) Evidence that the alien has commanded a high salary or other significantly high remuneration for services, in relation to others in the field; or
>
> (x) Evidence of commercial successes in the performing arts, as shown by box office receipts or record, cassette, compact disk, or video sales.

8 C.F.R. § 204.5(h)(3).  Nelson's petition sought eligibility based on the following five criteria:

1) membership in qualifying associations, id. § 204.5(h)(3)(ii); 2) published material relating to him and his work in the field, id. § 204.5(h)(3)(iii); 3) original contributions of major

significance in the field, id. § 204.5(h)(3)(v); 4) performance of a critical role for an organization

of distinguished reputation, id. § 204.5(h)(3)(viii); and 5) high salary, id. § 204.5(h)(3)(ix)

On December 19, 2019, USCIS issued a Request for Additional Evidence ("RFE"),

which explained that Nelson's evidence failed to satisfy any of the EB-1a criteria.  CAR 0368.

Nelson responded to the RFE on March 12, 2020 by providing additional evidence as well as

argument concerning the adequacy of the existing evidence.  See SOF ¶¶ 50-66.

USCIS denied Nelson's EB-1a petition on March 25, 2020, finding that his evidence

satisfied only two of the five claimed criteria: 1) critical role at an institution of distinguished

reputation and 2) receipt of a high salary.  CAR 0161-67.  In response to the denial, Nelson filed

a complaint in the U.S. District Court for the District of Columbia on July 17, 2020, alleging that

the USCIS decision was arbitrary and capricious in violation of the APA.  SOF ¶ 74; Nelson v.

USCIS, Case No. 1:20-cv-01934 (D.D.C.).

USCIS reopened Nelson's petition sua sponte and issued a Notice of Intent to Deny

("NOID") on August 20, 2020.  CAR 0131-44.  The NOID stated that the evidence presented by

Nelson established that he satisfied the critical role criterion but none of the other requirements

(including the high salary criterion) and offered Nelson an opportunity to submit further

evidence.  Id.  Nelson's response to the NOID, which was filed on September 21, 2020, provided

argument regarding the sufficiency of his petition, additional evidence to support the high salary

criterion, and argued that no further factual development was required.  CAR 0062-72.

USCIS denied Nelson's petition for a second time on November 19, 2020, finding that he

only satisfied the critical role criterion.  CAR 0001-23.  This November 19 final decision is the

subject of the Court's review.  Nelson filed an amended complaint on January 7, 2021, Doc. No.

12, and the case was ultimately transferred to this Court on February 26, 2021, Doc. No. 16.

II.    <u>LEGAL STANDARD</u>

The standard of review in this case is governed by the APA, pursuant to which a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).  Under this "highly deferential" standard, agency actions are presumptively valid.  <u>River St. Donuts, LLC v. Napolitano</u>, 558 F.3d 111, 114 (1st Cir. 2009).  A Court must therefore "affirm the agency's action as long as it is supported by a rational basis." <u>Copeland Pizza v. Napolitano</u>, No. CIV.A. 13-11437-DJC, 2014 WL 3896354, at *1 (D. Mass. Aug. 6, 2014); <u>accord</u> <u>River St. Donuts</u>, 558 F.3d at 114.  In other words, a court may find the agency abused its discretion "if there is no evidence to support the decision or if the decision was based on an improper understanding of the law."  <u>Kazarian v. U.S. Citizenship & Immigr. Servs.</u>, 596 F.3d 1118, 1118 (9th Cir. 2010) (quoting <u>Tongatapu Woodcraft Hawaii Ltd. v. Feldman</u>, 736 F.2d 1305, 1308 (9th Cir.1984)).

III.    <u>DISCUSSION</u>

The extraordinary ability visa is reserved for the select individual who has "a level of expertise indicating that the individual is one of that small percentage who have risen to the very top of the field of endeavor."  8 C.F.R. § 204.5(h)(2).  The "scant caselaw" on the topic "indicates that '[t]he regulations regarding this preference classification are extremely restrictive.'"  <u>Kazarian</u>, 596 F.3d at 1120 (alteration in original) (citing <u>Lee v. Ziglar</u>, 237 F.Supp.2d 914, 915 (N.D. Ill. 2002) (finding that "arguably one of the most famous baseball players in Korean history" did not possess the requisite extraordinary ability as a baseball coach)).  "Only aliens whose achievements have garnered sustained national or international acclaim are eligible for an 'extraordinary ability' visa."  <u>Id.</u> at 1120 (citations omitted).  "To

meet this strict definition, an alien must submit evidence that she has sustained national or international acclaim and that her achievements have been recognized in the field of expertise." Visinscaia v. Beers, 4 F. Supp. 3d 126, 131 (D.D.C. 2013).  The evidence must include either "a one-time achievement (that is, a major, international [sic] recognized award)," or (2) at least three of the ten criteria enumerated in the regulations.  8 C.F.R. § 204.5(h)(3).  As the petitioner, Nelson carried the burden to prove by a preponderance of the evidence that he was eligible for the benefit.  Rubin v. Miller, 478 F. Supp. 3d 499, 500 (S.D.N.Y. 2020) (citing 8 C.F.R. § 103.2(b)(1)).

Nelson contends that he satisfies five of the ten criteria.  Because the parties agree that Nelson has performed a critical role for an organization of distinguished reputation for the purposes of 8 C.F.R. § 204.5(h)(3)(viii), the Court limits its analysis to the remaining four criteria in dispute.

A.    Association Membership

The association membership criterion requires the petitioner to provide "[d]ocumentation of the alien's membership in associations in the field for which classification is sought, which require outstanding achievements of their members, as judged by recognized national or international experts in their disciplines or fields."  8 C.F.R. § 204.5(h)(3)(ii).

In support of this criterion, Nelson introduced evidence of his role as an "Ambassador" for the "Transparency Task Force" ("TTF") and his membership in the CFA Institute/CFA Boston Society ("the CFA").  This evidence took the form of:

- Letters from the founder and chairman of TTF, Andy Agathangelou;

- Background information about Agathangelou;

- Information about TTF and its Ambassadors;

- Verifications of Nelson's membership in the CFA;

- Information regarding CFA membership requirements and the CFA exam;

- Articles of Organization and By-Laws of the CFA Boston Society.

See SOF ¶¶ 27-30, 58-64 (citing CAR 0198-201, 0744-808).

USCIS determined that TTF is an association in Nelson's field, but "there is insufficient evidence to establish that TTF requires outstanding achievements of their members and that membership eligibility is judged by recognized national or international experts in their field." CAR 0004.  The letters from Agathangelou, CAR 0744-45, 0199-201, state, inter alia, that TTF's "appointment criteria is very selective," that "[i]ndividuals become Ambassadors on an invitation-only basis based on their specific achievements," and "Mr. Nelson was selected based on his decades-long experience as an innovator in the field of style analysis together with his passion to provide investors with transparent portfolio insights[.]"  CAR 0074-75.  USCIS explained that these generic descriptions were devoid of the detail necessary to understand TTF's membership selection process and whether "outstanding achievement" is truly required.  See CAR 0004.  USCIS found the other materials provided by Nelson similarly deficient, ultimately determining that the general descriptions of TTF's mission and its Ambassadors' achievements were not probative of TTF's specific membership requirements.  Id.

USCIS reasoned that Nelson's membership in the CFA did not satisfy the membership criterion for similar reasons.[3]  As a "regular member"[4] of the CFA, Nelson was required to show "four years of work experience in the investment decision-making process" and passage of the

---

[3] As with TTF, USCIS determined that the CFA was an association in Nelson's field.  CAR 0005.

[4] The CFA Boston Society also has an "honorary membership" designation, which is reserved for individuals "who [have] made distinguished contributions or who [have] given dedicated service to the profession of financial analysis or to the Corporation."  CAR 0302.

CFA Level I or Standards of Practice exam.  CAR 0793.  In addition, regular members must be sponsored by another regular member as well as their supervisor and must receive an approving vote by the Board of Directors.  CAR 0304.  In light of the evidence presented, USCIS determined that regular membership in the CFA required "professional . . . rather than outstanding achievement" and was not judged by recognized experts in the field.  CAR 0005.

Nelson contends that the evidence before USCIS established his membership in a selective group of only 156 TTF Ambassador members worldwide, the prestige of which is demonstrated by the accomplishments of its members and Agathangelou's letters.  See Doc. No. 40 at 21-22.  As for the CFA, Nelson points out that he maintains an elevated level of membership limited to individuals who satisfy certain requirements, including the passage of a professional examination.  Id. at 24-25.  Nelson also accuses USCIS of "engag[ing] in a piecemeal review" that disregarded the totality of the evidence.  Id. at 22-23.

A careful review of the record, however, reveals that USCIS's analysis was consistent with the language of the regulation, which demands membership in an organization that requires "outstanding achievement" as judged by experts, and not merely membership in selective organizations in the field.  See, e.g., Braga v. Poulos, No. CV 06-5105, 2007 WL 9229758, at *5 (C.D. Cal. July 6, 2007), aff'd, 317 Fed. Appx. 680 (9th Cir. 2009) (holding plaintiff's membership in multiple Jiu-Jitsu organizations did not satisfy the second criterion because plaintiff provided no evidence that any of the organizations required outstanding achievements of their members by, e.g., "requir[ing] a . . . black belt to join"); Soni v. United States, No. CV 11-2431, 2016 WL 4154137, at *4 (D.N.J. Aug. 2, 2016) (finding that the petitioner's membership in an organization that "requires individuals to pay a fee and undergo an application process, possess education and experience, and take and pass a multiple-choice examination consisting of

175 scored questions" did not satisfy the membership criterion).  Agathangelou's letters state that Ambassador membership is based on professional qualifications and enthusiasm but nowhere specifies what kind of outstanding achievement in the field is required.  CAR 0745 (stating Ambassadors are selected based on "specific achievements, industry credibility and experience, and a passionate commitment to the goals of the TTF"); CAR 0744 (describing Ambassadors as individuals "well aligned to the overall purpose and mission of the [TTF] and [who] have agreed to do what they can" to promote "transparency in financial services").  Moreover, one of the articles submitted by Nelson makes clear that Agathangelou likely does not qualify as an expert it in field.  It states Agathangelou "readily confess[es] he has little or no personal expertise in the issues he has taken on," CAR 0747, and is "not a subject matter expert whatsoever," CAR 0747-49.  Thus, Nelson has not shown that membership in the TTF, even as an Ambassador, satisfies either of the two required elements set forth in the standard (outstanding achievements as measured by recognized experts).  The CFA evidence similarly establishes that membership is open to anyone who meets run-of-the-mill application requirements.  Accordingly, the Defendants' determination was not arbitrary, capricious, an abuse of discretion, or "a clear error in judgment."

B.    Published Material

The third criterion requires the petitioner to present evidence of "[p]ublished material about the alien in professional or major trade publications or other major media, relating to the alien's work in the field for which classification is sought.  Such evidence shall include the title, date, and author of the material, and any necessary translation."  8 C.F.R. § 204.5(h)(3)(iii).

Nelson submitted articles published by the following media outlets: citywire.com, equities.com, etfexpress.com, Financial Times, The Globe and Mail, U.S. News & World

Report, Marketsmedia.com, IP&E, etfstream.com, and Funds Europe.  SOF ¶ 31; CAR 0879-1030.  In addition, he provided background information regarding the outlets, including, in some cases, circulation documentation.  SOF ¶ 32.  In his summary judgment papers, Nelson clarifies that the "qualifying articles include" an article from The Globe and Mail, an article from U.S. News and World Report, two articles from Financial Times, and an article from equities.com.  Doc. No. 45 at 12.  The Court therefore limits its analysis to these qualifying articles highlighted by Nelson.

The USCIS decision focuses on a primary deficiency in the articles provided: the articles quoted or mentioned Nelson but were not <u>about him</u> and his work in the field.  <u>See</u> CAR 0009 (explaining that the article from equities.com "was not about the Petitioner relating to the Petitioner's work in the field.  Rather, the Petitioner was being cited or quoted on the topic of environmental, social, and corporate governance"); CAR 0010 ("Neither of the articles [from Financial Times] were about Petitioner relating to the Petitioner's work in the field because both articles only cited or quoted the petitioner.  Likewise, the articles published in the Global [sic] and Mail [and] US News & World Report . . . only cited or quoted the Petitioner.").

USCIS's opinion also denied Nelson's request that it consider the articles under the "comparable evidence criterion," which allows a petitioner to submit "comparable evidence to establish the beneficiary's eligibility" if the defined criteria "do not readily apply to the beneficiary's occupation."  8 C.F.R. § 204.5(h)(4).  In support of this request, Nelson argued that "only an individual with outstanding achievements in his field would garner the type of international industry-wide notice that this press coverage reflects."  CAR 0012.  In refusing to apply the comparable evidence standard, USCIS reasoned that Nelson did not meet his burden to prove that the criterion was inapplicable to his field and instead "merely made general assertions

that [the published material criterion] does not apply and did not provide any evidence in support of the assertion."  Id.

Nelson takes issue with USCIS's allegedly narrow read of the published materials criterion, contending that articles that quote him or report on his views are, by definition, about him.  Doc. No. 40 at 26-27.  An illustrative example is the following quote from one of the Financial Times Articles titled "Value Investing Back in Fashion Amid Great Rotation": "According to Bernie Nelson, Style Research's head in the US, a high momentum strategy was underweight in financials earlier in the year and was therefore hit badly in the fourth quarter when financials rebounded."  CAR 0938.  Although reasonable people may disagree about what, exactly, qualifies as an article "about" a particular individual, USCIS's determination that articles mentioning Nelson were not "about" him was well within its discretion and certainly not arbitrary and capricious.[5]  See, e.g., Noroozi v. Napolitano, 905 F. Supp. 2d 535, 545 (S.D.N.Y. 2012) (finding that articles about the Iranian Table Tennis Team that "briefly mention the beneficiary," a member of the team, did not satisfy the published materials criterion).  Many articles quote experts.  Yet, a reasonable decisionmaker could conclude that these articles are not about the expert quoted nor are they comparable to such articles.

In the alternative, Nelson argues that USCIS abused its discretion by refusing to apply the comparable evidence standard to his published materials evidence.  Doc. No. 40 at 28-30.  In

---

[5] Whether the article titled "Style Research Digs Deeper on How to Invest in ESG" published by equities.com is about Nelson presents a closer question.  CAR 0916-22.  Nelson, however, bears the burden to show that the agency's determination was arbitrary and capricious.  A reader of this article could plausibly conclude that it is about seminars hosted by Style Research and not Nelson in particular.  In any event, Nelson made no such specific argument.  Even if Nelson could establish reversible error on this point (which he has not) his petition nevertheless fails because he cannot satisfy three of the requisite criteria for the reasons described above and below.

support of this argument, Nelson asserts:

> Only an individual with outstanding achievements in his field would garner the caliber of international industry-wide notice that Nelson's press coverage reflects, including in <u>The Globe and Mail</u>, <u>The Financial Times</u>, and <u>U.S. News and World Report</u>, as well as important media outlets serving the specific industry in which he works. Moreover, a finding that this evidence failed to meet the established criterion is strong evidence that a substitute category is required to consider it.

<u>Id.</u> at 29-30.  In essence, Nelson's position is that the comparable evidence standard must apply if the proffered evidence is insufficient.  USCIS rightfully disregarded this conclusory argument. In sum, USCIS considered the evidence before it and articulated a rational basis for its decision.

> C.      <u>Original Contributions of Major Significance</u>

Pursuant to the original contributions criterion, petitioners must introduce "[e]vidence of the alien's original scientific, scholarly, artistic, athletic, or business-related contributions of major significance in the field."  8 C.F.R. § 204.5(h)(v).

Nelson submitted the following evidence in support of this element of his petition:

- Opinion letters that attest to the impact of Nelson's work submitted by the following individuals: Robert Schwob, founder of and senior adviser to Style Analytics; Yury Dubrovsky, Managing Director and Chief Risk Officer of Lazard Ltd.; James LaFleur, Principal and Director of Client Consulting, East Market, Mercer Investments; David Hughes, Managing Director, Public Markets, J. Paul Getty Trust; and Christopher Callahan, Regional Head, North American Institutional, MFS Institutional Advisors. SOF ¶¶ 11; CAR 0345-49, 0430-55.

- Documents authored by Nelson describing the following proposed products: "Peer Analysis Module," "Peer Insights – Flexible Filtering," "Peer Insights – Fund Matching," and "Environmental, Social, and Governance Module."  SOF ¶ 18; CAR 0457-0542.

- Affidavits from Style Analytics executives Sebastian Roussotte, Robert Schwob, and Kristen English, confirming that Nelson created products and product enhancements for Style Analytics, namely "Peer Insights" and the "ESG Factor Analysis" tool.  SOF ¶ 19; CAR 0544-49.

- Copies of Style Analytics' contracts licensing its products to the following organizations: Aon, BNY Mellon, Mercer Investment Consulting, Fidelity, Epoch, Prudential Jennison, Vanguard, Wellington, and San Francisco City and County Employees' Retirement System.  SOF ¶ 23; CAR 0551-0678.

After a thorough assessment of the evidence, USCIS ultimately found it unpersuasive.  It disregarded the proposals, noting "[t]he proposals in the record cannot prove that Style Analytics, Inc. . . . used the ideas or adopted them as products – just as an application for a patent is not evidence of originality."  CAR 0013.  As for the letter from Schwob, USCIS found that it described Nelson's performance of routine "duties associated with" his role at Style Analytics, rather than his major contributions to the field.  Id.  The Schwob letter was also unpersuasive because it alluded to Nelson's responsibility for "pioneer[ing] new aspects of portfolio analysis within our analytics platform leading to new product designs and unique features in the marketplace" without specifying the products that Nelson created or demonstrating Nelson's impact on the field as a whole.  CAR 0013-14.

USCIS identified similar problems with the letters from Yury Dubrovsky, James LaFleur, David Hughes, and Christopher Callahan, which "provide a general overview of the Petitioner's accomplishments but fail[] to specify the exact original contribution and explain how it was of major significance to the field as a whole."  CAR 0014.  USCIS also noted that letters of support "cannot form the cornerstone of a successful extraordinary ability claim" without independent documentation of the petitioner's original contributions."  Id.

Turning next to the affidavits, USCIS found that Nelson could not rely on affidavits to prove the originality of his contributions without proof that primary or secondary evidence (such as a published scholarly article or documentation from the USPTO) was unavailable under 8

C.F.R. § 103.2(b)(2)(i).[6]  CAR 0014, 0016.  USCIS also noted that the affidavits were not

adequately sworn to or affirmed.  CAR 0014.  Nevertheless, USCIS assessed the affidavit from

Schwob and found that it only attested to the importance of Nelson's product innovations to

Style Analytics, and not the broader field.  CAR 0017.  USCIS also observed "even if Mr.

Schwob attested to Peer Insights being of major significance to the field, there is insufficient

objective, documentary evidence in the record that shows the impact or influence Peer Insights

had throughout the style research and quantitative field and not just with the organization."  Id.

Finally, with respect to the contracts, USCIS concluded that they did not clearly delineate

or "specify the product being licensed," which prevented it from "determin[ing] the impact or

influence of Petitioner's purported original contribution like the Peer Insights."[7]  CAR 0018.

In his Motion, Nelson takes issue with various elements of USCIS's opinion.  First, he

contends that the opinion letters combined with the other evidence illustrate Nelson's impact on

the industry and identify specific Style Analytics' products.  See Doc. No. 40 at 17-21.  Second,

---

[6] The full text of the relevant portion of the regulation states:

> The non-existence or other unavailability of required evidence creates a presumption of ineligibility. If a required document, such as a birth or marriage certificate, does not exist or cannot be obtained, an applicant or petitioner must demonstrate this and submit secondary evidence, such as church or school records, pertinent to the facts at issue. If secondary evidence also does not exist or cannot be obtained, the applicant or petitioner must demonstrate the unavailability of both the required document and relevant secondary evidence, and submit two or more affidavits, sworn to or affirmed by persons who are not parties to the petition who have direct personal knowledge of the event and circumstances. Secondary evidence must overcome the unavailability of primary evidence, and affidavits must overcome the unavailability of both primary and secondary evidence.

8 C.F.R. § 103.2(b)(2)(i).

[7] For example, the contracts describe the products being licensed as "our Style Research Enterprise Portfolio Analyzer Service" and/or the "Style Research Peer Insights online service." See, e.g., CAR 0552, 0677.

Nelson claims that USCIS abused its discretion by disregarding the affidavits, explaining that the cited regulation applies only to the use of affidavits in lieu of a required document such as a birth or marriage certificate.  Id. at 19.  Third, he argues that USCIS erred by failing to give significant weight to the opinion letters.  Id. at 20.  Finally, he complains that USCIS failed to consider the evidence as a whole and instead engaged in a piecemeal review.  Id. at 20-21.

The USCIS's analysis is consistent with the relevant regulatory language, which requires evidence both of an original contribution and its impact on the broader field.  Though the letters certainly speak highly of Nelson, USCIS did not err in determining that the "conclusory statements" contained therein were "not sufficient for purposes of meeting his burden of proof in these proceedings."  Soni, 2016 WL 4154137, at *5 (quoting In re Soffici, 22 I. & N. Dec. 158, 165 (BIA 1998)); see also Visinscaia, 4 F. Supp. 3d at 135 (finding that letters describing a dancer's use of original weight transfer techniques that had been adopted by other competitors were insufficient to support her petition absent specific evidence regarding the impact of the dance technique on the field as a whole).  Moreover, USCIS "did give some weight to the letters—just not the weight [Nelson] would prefer."  Visinscaia, 4 F. Supp. 3d at 135.  The proposals and contracts may provide evidence that Nelson's ideas were adopted by his company and others, but USCIS did not act arbitrarily in concluding that such documentation, without more, failed to establish the type of widespread acclaim that the regulation demands even in the context of the entire record.

Assuming arguendo that USCIS's disregard of the affidavits was improper, it nevertheless constituted harmless error for the reasons already explained, namely that the affidavits fail to provide objective evidence of Nelson's impact on the field as a whole.  See Amin v. Mayorkas, 24 F.4th 383, 394 (5th Cir. 2022).  In addition, USCIS did consider the

15

Schwob affidavit and explain its conclusion that the affidavit did not provide probative evidence of Nelson's contributions to the field.  CAR 0017.

A holistic review of the evidence reveals that Nelson's submissions are insufficient to carry his burden.  Here, the individual submissions suffer from the problems noted and, collectively, point to no different conclusion than when considered individually.

Accordingly, USCIS did not abuse its discretion in finding that Nelson failed to satisfy the original contribution criterion.

D.      High Salary

The final criterion upon which Nelson relies is high salary.  The regulation provides that the non-citizen must present "[e]vidence that [he] has commanded a high salary or other significantly high remuneration for services, in relation to others in the field."  8 C.F.R. § 204.5(h)(3)(ix).

Nelson produced the following evidence to show that he commands a high salary:

- A study and letter from Yale University Professor, Steven Riethmueller.  CAR 0351-54, 0850-72.  Riethmueller determined that, in 2017, Nelson's total cash compensation was $416,500[8] and Style Analytics' revenue was $3,742,390.  CAR 0851-53.  Using data from "CompStudy," Riethmueller analyzed the salaries of similarly situated individuals using the following filters: 1) title: president/COO; 2) industry: technology (excluding life sciences companies); 3) geographic region: United States; 4) annual revenue of employer: no more than $5,000,000; 5) employer headcount: no more than 20 employees; 6) time period: 2017; 7) no limitation on number of financing rounds for private equity/venture backed companies; 8) profitable and non-profitable companies included. CAR 0854.  Riethmueller concluded: "the top base salary for Presidents/COOs in the 2017 survey . . . did not exceed $300,000 (compared to Mr. Nelson's annual base salary of $400,000), and the actual bonus received for Presidents/COOs in the 2017 CompStudy survey . . . did not exceed $75,000, for a total of $375,000 in total cash compensation." Id. (emphasis in original).

- A study from the Economic Research Institute ("ERI") for the years 2014-2018.  CAR 0821-48.  According to the study, the 90th percentile salary for Presidents who work for

---

[8] This number is comprised of Nelson's $400,000 base salary and $16,500 gross bonus.  CAR 0852-53.

companies with $5,000,000 in revenue in the "Software Publisher" industry in Boston was $390,711 in 2018 in addition to a $104,366 incentive.  CAR 0821-22.  For those Presidents who work for companies with revenue of $3,742,390, the 90th percentile salary and incentive in 2018 was $365,860 and $92,543 respectively.  Id.

- Department of Labor ("DOL") wage surveys showing the annual mean wage for all categories of Chief Executives as of May 2019, the top wage level nationally for Chief Executives in 2019, and the highest level wage rate for Chief Executives in Boston from July 2020 to June 2021.  CAR 0074-84.

- Nelson's IRS W-2 Forms from 2010 to 2018 and a chart summarizing his earnings compared to the ERI data.  CAR 0422-23, 0811-19.

Though USCIS pointed to several flaws in Nelson's evidence,[9] it focused on one in particular: the data was insufficiently tailored to Nelson's field of style analysis and quantitative risk management.  With respect to the Riethmueller study, for example, USCIS explained:

> the study is insufficient because the basis of the data is using the company's field, technology . . . . The industry of the company is not a relevant factor in determining in relation to [sic] other's [sic] in a petitioner's field because the Petitioner's field may differ from the company's industry or field.

CAR 0022.

Nelson responds by asserting that the surveys provide appropriate comparison data because Style Analytics "is a technology company that develops software for investment professionals to conduct financial analysis" and therefore "the use of salary data for technology company and software development company executives is . . . completely consistent."  Doc. No. 40 at 12.  Nelson also defends his reliance on the DOL surveys by arguing that salary data for all chief executives includes, by definition, the salaries of those working in Nelson's field. Id.

---

[9] For example, USCIS pointed out "that Petitioner submitted evidence to [sic] combined both salary and remuneration."  CAR 0020.  USCIS appears to be incorrect on this point as the Riethmueller study provides a breakdown of Nelson's salary and bonus.  CAR 0852-53.  USCIS also noted that some of the survey data was based on calculations that postdated Nelson's petition and was therefore irrelevant to the analysis.  CAR 0021.

Nelson's final argument is that USCIS abused its discretion by <u>sua sponte</u> reopening its initial decision after he filed his complaint in the District Court.  <u>Id.</u> at 15-17.  As explained <u>supra</u>, USCIS's first decision found that Nelson met two of the three required criteria (high salary and critical role), whereas the final decision determined that Nelson satisfied only the critical role criterion.  Nelson urges the Court to deem USCIS's reversal arbitrary and capricious, noting that the NOID did not provide an explanation for the reopening and that <u>sua sponte</u> reopenings in other immigration contexts are disfavored.  <u>Id.</u>

Once again, the Court's review of the record reveals that USCIS acted within its discretion in determining that Nelson did not satisfy the high salary criterion.  Nelson attempts to define his field both narrowly (style analysis and quantitative risk management) and broadly (technology) as it suits him.  Yet, the regulation requires the petitioner to introduce proof that he earns a high salary compared to others <u>in his "field"</u> and Nelson has identified style analysis and quantitative risk management as his field.  USCIS reasonably determined that surveys summarizing the salaries of executives working in the broad fields of technology and software publishing, as well as data compiling the salaries of all chief executives, do not provide an appropriate comparison group given Nelson's claimed expertise, which seemingly lies at the intersection of investment management and technology.  <u>See</u>, <u>e.g.</u>, <u>Skokos v. U.S. Dep't of Homeland Sec.</u>, 420 F. App'x 712, 713–14 (9th Cir. 2011) (holding that the petitioner, a security consultant for a public figure, did not satisfy the high salary criterion because "[t]he only evidence in the record of comparable salaries is that of the average 'security guard'");  <u>Xia v. Miller</u>, No. 3:20-CV-01468-JR, 2021 WL 5817324, at *7 (D. Or. Nov. 18, 2021), <u>report and recommendation adopted</u>, No. 3:20-CV-01468-JR, 2021 WL 5825999 (D. Or. Dec. 6, 2021) (explaining that a tennis table coach who introduced evidence of "sports coach salaries" did "not

sufficiently explain why the salaries these reports reflect create an apples to apples, rather than apples to oranges comparison: USCIS notes that these reports may include coaches at educational institutions and coaches in other sports, both inapt comparisons for plaintiff").

Finally, the sua sponte reopening does not support the conclusion that USCIS abused its discretion.  As Nelson himself points out, such reopenings appear to be a "common practice" of the USCIS.  Doc. No. 40 at 16 (citing Berardo v. USCIS, Case No. 3:19-cv-01796-SB, n. 4 (D. Or. 2021)).  Indeed, 8 C.F.R. § 103.5(a)(5)[10] permits an agency to reopen or reconsider a previously final action.  Cf. Ahlijah v. Nielsen, No. CV PX-17-1720, 2018 WL 3363875, at *2 (D. Md. July 10, 2018), aff'd, 755 F. App'x 290 (4th Cir. 2019) (citations omitted) ("[F]ederal courts across the country have consistently held that it is within the agency's power . . . to reopen and reconsider previously 'final' agency actions.").  Other than the decision to reopen Nelson's case after he filed in the District Court, he points to no evidence suggesting that USCIS acted in bad faith.  And, even if he did, Nelson has failed to establish that he can satisfy three of the required criteria and therefore is not entitled to relief in any event.  In light of the foregoing, the Court need not resolve the question of whether USCIS's decision to reopen the case was an abuse of discretion.

---

[10] 8 C.F.R. § 103.5(a)(5)(ii) provides:

> When a Service officer, on his or her own motion, reopens a Service proceeding or reconsiders a Service decision, and the new decision may be unfavorable to the affected party, the officer shall give the affected party 30 days after service of the motion to submit a brief. The officer may extend the time period for good cause shown. If the affected party does not wish to submit a brief, the affected party may waive the 30–day period.

E.     Final Merits Determination

Even if an EB-1a petitioner can satisfy three of the ten criteria, the petition is still subject to Step Two of the process: a "final merits" determination by the USCIS.  Kazarian, 596 F.3d at 1119-20.  At stage two, USCIS "[e]valuate[s] all the evidence together" to assess whether the petitioner possesses "the high level of expertise required for this immigrant classification." Policy Manual Chapter 2 – Extraordinary Ability, U.S. Citizenship and Immigration Services, https://www.uscis.gov/policy-manual/volume-6-part-f-chapter-2.

With respect to the final merits determination, the agency briefly concluded:

[A] review of the record in the aggregate supports a finding that the Petitioner has not established the level of expertise required for the classification sought. Specifically, while the Petitioner has documented some success as a President in the field of style analysis and quantitative risk management and that he performed a leading and critical role for Style Analytics, Inc., the evidence does not sufficiently demonstrate that he is in the small percentage at the top of the field or show the sustained national or international acclaim required for this highly restrictive classification. Nor, does the record include extensive documentation showing recognition of the Petitioner's achievements in the field.

CAR 0022-23.  The Plaintiff disputes that USCIS conducted a proper merits determination, but argues that he is entitled to approval of his petition as a matter of law rather than a remand to USCIS for review.  Doc. No. 40 at 30.  Even if Nelson could satisfy the requisite Step One criteria (which he has not done), he is not entitled to approval of his EB-1a petition at the final merits stage largely for the reasons previously stated.  Though a review of the evidentiary submission reveals that Nelson is a successful professional, success alone is not enough.  Nelson has not pointed to evidence in the record distinguishing him from the merely successful and qualifying him as extraordinary.  Of course to prevail, he must not only point to such evidence, he must establish that the differing conclusion reached by USCIS was arbitrary and capricious. He has done neither, thus his petition fails at the final merits stage.

20

V.    <u>CONCLUSION</u>

For the reasons stated herein, Nelson's Motion for Summary Judgement, Doc. No. 39, is

DENIED and the Defendants' cross-motion, Doc. No. 36, is ALLOWED.  Separate judgment

shall issue, and the Clerk shall close the case.


SO ORDERED.


 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge